OPINION OF THE COURT BY
JUSTICE VENTERS
This appeal arises out of a medical malpractice claim brought in the McCracken Circuit Court by Appellee, Jacqulyn G. Harrington, alleging that Appellant, Dr. Alex Argotte, failed to obtain her informed consent before undertaking a surgical procedure on her. In Harrington’s opening statement at trial, her attorney informed the court and the jury that she wquld not present an expert witness because “you can use your own common sense” to determine if Harrington had been informed of the risks associated with the procedure. After concluding that Harrington could not prevail without the opinion of a testifying expert, the trial court dismissed Harrington’s claim before the first witness was called.
The primary issue before us is whether Harrington’s concession that she would not present an expert’s testimony justified the trial court’s entry of a directed verdict. The Court of Appeals reversed, concluding that the trial court too hastily dismissed the case since the evidence to be presented at trial may have established an exception to the general rule requiring expert testimony to establish a professional standard of care. The Court of Appeals rendered its opinion one month before the publication of our opinion in Sargent v. Shaffer, 467 S.W.3d 198 (Ky. 2015), which plumbed the depths of Kentucky’s statutory standard for informed consent, KRS 304.40-320. On discretionary review, we affirm the judgment of the Court of Appeals, although we do so on different grounds based upon our decision in Sargent Consequently, we remand the matter to the trial court for further proceedings.
I. FACTUAL AND PROCEDURAL BACKGROUND
Dr. Argotte performed two surgical procedures for Harrington: the placement of an inferior vena cava filter (IVC filter) and a subsequent gastric bypass surgery. Harrington’s claim pertains only to the placement of the IVC filter which was done as a necessary antecedent to the gastric bypass surgery.
Before implanting the IVC filter, Dr. Argotte obtained a written consent form signed by Harrington. Pertinent provisions of the form are as follows:
I have been informed of the nature, risk, consequences, and alternatives of the operation or procedure to be performed. The hospital is requesting that I sign this request form stating that I fully *553 understand the operation or procedure, which was explained by my doctor.
Physician Statement Risk:
Migration of filter[1]
I have been made fully aware by Dr. Argotte and/or his staff of the procedure to be performed and I am now aware of the risks involved.
Harrington testified in a pre-trial deposition that neither Dr. Argotte nor his staff explained the consent form to her and that she felt rushed by Dr. Argotte’s office staff to sign the papers they handed to her. Harrington also testified that Dr. Argotte advised her that the IVC filter was necessary to protect her from the risks associated with a pulmonary embolism (a blood clot) that might form as a result of the bypass surgery. He told Harrington he would not perform the gastric bypass procedure without having the IVC filter in place. Harrington testified that Dr. Ar-gotte never personally advised her of any risks associated with the IVC filter or the process of implanting it. She was, of course, ostensibly aware from the written form that “migration of filter” was a risk, but she was not told that the filter could fracture and that fragments of the filter could break loose and travel through her veins to affect vital organs.
About two and one-half years after these procedures were performed, Harrington suffered severe chest pain. Prompt medical treatment disclosed that the IVC filter had fractured, allowing fragments of the device to migrate to her lungs and lodge there. Doctors surgically removed the main component of the IVC filter but the fragments in her lungs could not be removed. She complains of continuing pain and discomfort and fear that fragments may migrate further resulting in serious harm or death.
In his opening statement at the start of the trial, Harrington’s attorney explained to the court and the jury that the evidence would show that Dr. Argotte obtained Harrington’s consent to the procedure without adequately informing her of the risks associated with the implanting of an IVC filter. He displayed an enlarged photocopy of the signed consent form identifying “migration of filter” as a risk but revealing nothing about the risk of “fracturing” or “fragmentation” of the filter. Counsel informed the jury that the evidence would show that Dr. Argotte never informed Harrington of the risk that the filter could fracture and break into fragments which, could then lodge in her lungs, despite his knowledge of that possibility, and that future health problems or death could result from such fragmentation. Counsel also told the jury that the evidence would show that Dr. Argotte never informed Harrington that the IVC filter could eventually be removed to eliminate the risk of harm from fragmentation. Counsel also acknowledged that Harrington would not have a doctor testifying “about what a doctor should have told her,” stating that the jurors could use their common sense to decide what a person in Harrington’s shoes should have been told.
At the close of Harrington’s opening statement, Dr. Argotte moved for a directed verdict, arguing that without an expert witness, Harrington was unable to prove a breach of the standard of care regarding informed consent. After considering arguments, the trial court agreed that Harrington could not prevail at trial. Accordingly, the trial court directed a verdict in favor of Dr. Argotte and dismissed Harrington’s claim.
The Court of Appeals reversed the dismissal and remanded the matter to the *554 trial court. The Court of Appeals concluded that the trial court failed to consider that evidence adduced at trial could establish an exception to the general rule requiring expert testimony in medical cases. We granted discretionary review to address the granting of a directed verdict at the conclusion of the opening statement and to further examine whether Harrington’s lack of informed consent claim could survive without an expert witness.
II. ANALYSIS
A. Directed verdicts on opening statements
Before addressing the substantive issue relating to informed consent, we must first address the unusual procedural posture of this case: the granting of a directed verdict dismissing the plaintiffs claim immediately after the plaintiffs opening statement. The general standard for granting a directed verdict is applicable here as it is in any directed verdict situation. “[A] trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if ho disputed issues of fact exist upon which reasonable minds could differ.” Bierman v. Klapheke, 967 S.W.2d 16, 18-19 (Ky. 1998). “The trial court must draw all fan and reasonable inferences from the evidence in favor of the party opposing the motion.” Commonwealth v. Sawhill, 660 S.W.2d 3, 5 (Ky. 1983). On appellate review of an order granting a directed verdict, the test is whether “under the evidence as a whole it would not be clearly unreasonable for a jury to find [for the plaintiff].” Id.
Both parties in this action recognize, and we agree, that a directed verdict may be granted immediately after an opening statement. However, that summary disposition of a case is proper “only when counsel has made admissions that are fatal to his client’s case.” Baker v. Case Plumbing Manufacturing Co., 423 S.W.2d 258, 259 (Ky. 1968) (citing Riley v. Hornbuckle, 366 S.W.2d 304, 305 (Ky. 1963)).
[T]he court may take a case from a jury or enter judgment where it is clear from an opening statement either that the plaintiff cannot recover or that the defendant has no defense, as the case may be. This regards the statement as a judicial admission of the nonexistence of or inability to prove a cause of action or a defense, but even in such a case the action of the court should be exercised cautiously and only where the admission is clear.
Co-De Coal Co. v. Combs, 325 S.W.2d 78, 79 (Ky. 1959).
In general, a directed verdict should not be granted until the conclusion of the plaintiffs case. ... Nevertheless, Kentucky cases recognize the power of a trial court to decide a case upon the opening statements of counsel where they clearly and definitely disclose no cause of action or no defense, or admit facts the existence of which precludes a recovery by their clients. However, the cases admonish that the practice is a dangerous one and the power should be exercised with caution.
Lambert v. Franklin Real Estate Co., 37 S.W.3d 770, 774 (Ky. App. 2000).
Because fatal judicial admissions in opening statements are rare and the consequences of a directed verdict before hearing the evidence are severe, prudent trial judges are cautious and normally reluctant to grant such relief. Although we disagree with the trial judge’s decision to grant a directed verdict in this case, we commend the caution and careful deliberation he applied to the issue.
With this affirmation that a directed verdict may be properly granted at opening statements before the presentation of *555 any evidence, we next consider whether this directed verdict was properly granted. The dispositive question is whether, the acknowledgement in Harrington’s opening statement that she would not present an expert witness to prove her claim that Dr. Argotte failed to obtain her informed consent was a judicial admission of a “complete absence of proof on a material issue,” Bierman, 967 S.W.2d at 18, and thus fatal to her case, Baker, 423 S.W.2d at 259.
B. Lack of informed consent and the need for expert testimony
To determine whether Harrington’s admission that she would not present expert testimony was fatal to her claim, we must examine the nature of her claim that Dr. Argotte failed to obtain her informed consent to implant the IVC' filter; We begin with a review of what Kentucky law requires a physician to do in order to obtain the patient’s informed consent.
KRS 304.40-320 establishes the legal standard for the informed consent that a physician must have before exposing a patient to the risks associated with a particular medical procedure. As we explained in Sargent, 467 S.W.3d at 206-207, a physician obtains the patient’s informed consent to perform a medical procedure when the two elements of the statutory standard are met. First, pursuant to subsection (1) of KRS 304.40-320:
The action of the health care provider in obtaining the consent of the patient or another person authorized to give consent for the patient was in accordance with the accepted standard of medical or dental practice among members of the profession with similar training and experience.
Second, pursuant to subsection (2) of KRS 304.40-320:
A reasonable individual, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedure and medically or dentally acceptable alternative procedures or treatments and substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other health care providers who perform similar treatments or procedures.
The first element of informed consent' requires that the actions of the defendant physician in obtaining the patient’s consent to be within the acceptable standard of practice of the applicable medical specialty. The second element of informed consent is an objective standard, requiring that. the risk information conveyed to the patient, by the health care provider must be such that it provides, .not the specific patient, but “a reasonable individual,” with “a general understanding of the ... substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other health care providers who perform similar treatments or procedures.” As explained in Sargent:
Subsection (1) covers the means employed by the health care provider to obtain the patient’s consent. The ‘action of the health care provider’ in obtaining consent must be ‘in accordance with the accepted standards of [the relevant] medical or dental practice^]’ KRS 304,40-320(1). Quite differently. Subsection (2) covers the content of ‘the information provided,’ and it sets forth the objective standard that ‘a reasonable individual’ must gain from that information a ‘general understanding1 of the risks ‘recognized among health care providers who. perform similar treatments[.]’ KRS 304.40-320(2). The two subsections perform very different func *556 tions and address two different aspects of ‘informed consent.’
467 S.W.3d at 209.
Significant to our review is our conclusion in Sargent, based upon the conjunctive use of the word “and” in the statute between the two subsections of KRS 304.40-320, that to satisfy the statutory standard for obtaining the patient’s informed consent, the physician must comply with both subsections. Id. at 207 (“Construed in accordance with its plain terms and obvious meaning, it is readily apparent that ... a medical treatment provider has satisfied the duty to obtain the patient’s consent only if both provisions are met.”). Consequently, a breach of the statutory standard may be established by proving that the medical provider failed to meet either one of the two subsections of KRS 304.40-320.
To show that a physician failed to comply with subsection (1) of the statute, a plaintiff must show the physician’s actions for obtaining consent fell outside “the accepted standard of medical or dental practice.” Ordinarily, the failure to comply with a medical profession standard can only be proven by expert testimony. We agree that under the circumstances before us that without expert testimony, Harrington could not show that “the actions of [Dr. Argotte] in obtaining the consent of the patient [were not] in accordance with the accepted standard of medical ... practice.” KRS 304.40-320(1). But the viability of Harrington’s claim doés not depend upon showing a violation of KRS 304.40-320(1). Even if Harrington conceded that element to Dr. Argotte, she could nevertheless prevail on her claim by showing that the information he provided regarding the risk failed to satisfy the second element, KRS 304.40-320(2). To comply with the statute, the healthcare provider must satisfy both elements of informed consent.
Proving the failure to comply with subsection (2) of KRS 304.40-320 requires an expert opinion only as needed to establish “whether the ‘risks and hazards’ involved [in the plaintiffs claim] are among those ‘recognized among other-health care providers who perform similar treatments or procedures.’” Sargent, 467 S.W.3d at 209: Otherwise, whether the physician’s notice to the patient would provide “a reasonable individual” with a “general understanding of the procedure and ... [the] substantial risks and hazards inherent in the proposed treatment” is a question “perfectly suited for application by jurors of ordinary competence, education, and intellect” without the need for expert testimony. Id.
Dr. Argotte himself provided the expertise required to show what risks associated with the IVC filter should be included in the notice to the patient. In a pre-trial deposition which would be available as evidence at trial, Dr. Argotte testified that the risks associated with an IVC filter included the risk that it could “fracture and migrate.” Therefore, the only issue remaining was the factual question of whether the information he provided about those risks, “migration of filter,” would provide “a reasonable individual” with “a general understanding” of the risk that the filter could break into fragments which could then migrate to other bodily organs. That factual question is one that could readily be resolved by reasonable jurors without the assistance of expert testimony.
Perhaps a physician would understand “migration of filter” to be synonymous with “fracturing and fragmenting” and, therefore, within the professional standard of care. But the obvious function of KRS 304.40-320(2) is to require physi *557 cians to inform patients of the risks associated with their treatment using terms generally understandable to a “reasonable individual.” Harrington’s admission that she would not call an expert witness may have foreclosed her ability to prove that Dr. Argotte failed to comply with subsection (1) of KRS 304.40-320, but it was not a judicial admission that would defeat her ability to prove the physician’s failure to comply with KRS 304.40-320(2).
To summarize, Harrington’s admission that she would not call an expert to testify was not fatal to her claim and thus was not a proper basis for entry of a directed verdict. Even if Dr. Argotte’s actions, with respect to informing Harrington of the risks she faced, satisfied the professional standard under subsection (1) of KRS 304.40-320, or Harrington’s lack of expert testimony made it impossible for her to prove otherwise, reasonable minds could still differ on whether Dr. Argotte complied with the KRS 304.40-320(2). Since providing informed consent requires compliance with both statutory elements, Harrington could make out a prima facie case by negating only one aspect of the statutory informed consent standard.
Because all parties acknowledged that fracturing and fragmenting of the filter, and the subsequent migration of filter fragments, to other parts of the body, were risks associated with the procedure, the question of fact remaining was whether the phrase “migration of filter” would provide a reasonable individual with a general understanding of that risk. No expert is required for that determination. Consequently, Harrington’s admission that she would not be presenting an expert witness cannot be regarded as an admission negating Harrington’s cause of action. The trial court erred in granting the directed verdict.
C. Harrington’s claim that Dr. Argotte failed to inform her that the IVC filter could be removed
Harrington also asserted at trial that Dr. Argotte breached his duty to obtain her informed consent because he failed to inform her that the IVC filter could be removed. This facet of her claim was also dismissed with the directed verdict. We find no fault with the dismissal of that claim. The fact that the IVC filter could be removed after her bypass surgery is not “a substantial risk” of the IVC filter placement and thus is not subject to the duty of giving informed consent. KRS 304.40-320 is not implicated in that issue.
Perhaps proper medical care dictates that Harrington should have been advised that the filter could be removed; perhaps not. The issue required medical expertise that Harrington apparently did not have. We conclude that the dismissal of that claim by the trial court was proper.
III. CONCLUSION
For the foregoing reasons, we affirm the Court of Appeals’ decision to reverse the judgment of the McCracken Circuit Court dismissing Appellee’s claim. This matter is hereby remanded to the McCracken Circuit Court for further proceedings consistent with this opinion.
All sitting.
Cunningham, VanMeter, and Wright, JJ., concur.
Keller, J. concurs in part and dissents in part by separate opinion in which Minton, C.J. and Hughes, J. join.

. The form also identified 19 other "risks” but none of them are pertinent to this appeal.